UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 24-cr-433 (LLA) |
| : | |
| **TYRELL LAMONTE BAILEY,** : | |
| "also known as Black or Little Black," : | |
| : | |
| **Defendant.** : | |
| : | |

## UNITED STATES'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. On July 11, 2025, Tyrell Bailey (the "defendant") pleaded guilty to Count One of the Indictment, charging him with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). But this case is different from the usual prosecution for illegal possession of a firearm. Here, the defendant's conduct demonstrated a blatant disregard for the law, for the safety of the community, and for the lives of the officers attempting to apprehend him. While illegally armed, the defendant fled from police—placing residents and the pursuing officers directly in harm's way—before discarding his loaded gun in a storm drain along Interstate 295. That reckless act had fatal consequences: the firearm discharged when Investigator Wayne David attempted to recover it, killing him.

The defendant's choices culminated in the death of a police officer and his conduct reflects not only an unwillingness to comply with the law, but a willingness to endanger anyone who stands between him and accountability. For these reasons, and those detailed below, the United States respectfully recommends a sentence at the top of the applicable Guideline range: 71 months'

1

incarceration, followed by three years' supervised release, as this is the only sentence that will adequately reflect the seriousness of the offense, promote respect for the law, protect the public, and deliver a just punishment for the defendant's conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

On Wednesday, August 28, 2024, at approximately 5:30 p.m., members of the Metropolitan Police Department's (MPD) Robbery Suppression Unit (RSU) were patrolling the area of the 1600 block of Kenilworth Avenue Northeast and the 4400-4500 blocks of Quarles Street Northeast, Washington, D.C., when they observed the defendant, Tyrell Bailey, who was wearing a white t-shirt, blue shorts, and white shoes, and was on the phone. *See* Images 1 and 2.



*Images 1 and 2*

RSU officers parked, exited their vehicles, and began patrolling on foot the area around 4506 Quarles Street Northeast, when the defendant fled unprovoked. *See* Image 3. As the defendant fled, he held his waistband in a manner consistent with carrying a concealed firearm.



*Image 3 – BAILEY, circled in red, running from RSU officers, circled in green.*

RSU members gave chase as the defendant ran through the D.C. Public Housing complex in the 4400-4500 blocks of Quarles Street Northeast. The defendant climbed over the retaining wall in the 1600 block of Kenilworth Avenue Northeast that abuts Interstate 295, and jumped the approximately 20-foot wall. He landed in the southbound lane of I-295. *See* Image 4.



*Image 4 – the defendant, circled in red, jumping down the wall onto I-295*

After jumping the wall, the defendant stopped his flight from police to discard his gun into a storm drain on the shoulder of the southbound lane of I-295. When officers reached the storm drain where they saw the defendant pause and appear to drop something, they saw a gun laying in the drain several feet down.  *See* Image 5.



*Image 5*

The defendant then continued his flight northbound on I-295 in the southbound lanes. He crossed to the northbound side of I-295, flagged down a passing motorcyclist, and fled the area northbound on the back of the motorcycle. His reckless flight placed not only the pursuing officers at risk, but also motorists traveling on the major interstate highway.

As an officer trained in crime scene processing and firearms recovery, MPD Investigator Wayne David responded to the scene to recover the firearm discarded by the defendant. Investigator David attempted to remove the storm drain cover to recover the firearm, but was

4

unsuccessful. While attempting to recover the firearm without removing the cover, the firearm unintentionally discharged, striking Investigator David in the head. He was transported to MedStar Washington Hospital Center where he would later succumb to his injuries.

A Technician with the Department of Forensic Sciences eventually removed the metal grate covering the storm drain and recovered a Smith and Wesson M+P Shield 40, .40 caliber handgun, with one round of .40 caliber ammunition in the chamber, and eight rounds of .40 caliber ammunition in the magazine inserted into the weapon. The gun itself had a modified serial number. *See* Images 6-7. Specifically, the serial number was modified in a way that it was not discernable by the naked eye, but could be visible through microscopic examination.



*Image 6 – The Smith & Wesson as it was discovered in the storm drain after the storm drain was removed*

 

*Image 7 – Modified serial number just below the slide on the handle (in yellow)*

On September 5, 2024, the defendant was charged by Complaint with three counts: (1) Unlawful Possession of a Firearm by an individual Convicted of a Crime Punishable by More than One Year's Imprisonment, in violation of 18 U.S.C. § 922(g)(1); (2) Possession of a Firearm With an Obliterated Serial Number, in violation of 18 U.S.C. § 922(k); and (3) Unlawfully Discarding a Firearm and Ammunition, in violation of 22 D.C. Code § 4503.04. The defendant's initial appearance was held on September 5, 2024.

On September 10, 2024, the defendant appeared for a detention hearing before the Honorable G. Michael Harvey, who ordered the defendant detained pending trial. On September 25, 2024, the defendant was indicted on the same counts charged in the Complaint. On March 13, 2025, this Court released the defendant into home detention with GPS monitoring. The defendant ultimately pleaded guilty to Count One, Unlawful Possession of a Firearm by an individual Convicted of a Crime Punishable by More than One Year's Imprisonment, in violation of 18 U.S.C. § 922(g)(1).

Sentencing is currently scheduled for December 17, 2025.

## **LEGAL STANDARD**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .; and
> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
> (A) issued by the Sentencing Commission . . . and
> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

        (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## **GUIDELINES CALCULATION**

As the Plea Agreement (ECF No. 29) notes, the parties disagree about whether the four-point enhancement in U.S.S.G. § 2K2.1(b)(4)(B)(i) applies because the recovered firearm had a modified serial number. As described above, the serial number was modified in a way that makes it indiscernible to the naked eye, but could be visible through microscopic examination. The

defendant contends that because the serial number could be discernable through a microscope, it cannot be considered "altered or obliterated."

At the time of the defendant's offense, U.S.S.G. § 2K2.1(b)(4)(B)(i) required the application of the 4-point enhancement if the "firearm had an altered or obliterated serial number[.]" U.S.S.G. § 2K2.1(b)(4)(B)(i) (Nov. 2023); *see also* U.S.S.G. § 2K2.1 (Nov. 2023), Cmt. 8 (directing the application of the enhancement "if the offense involved a firearm with an altered or obliterated serial number"). This language was amended on November 1, 2024 to state that the enhancement applies if the "firearm had a serial number that was modified such that the original information is rendered illegible or unrecognizable to the unaided eye," which is the current operative language. U.S.S.G. § 2K2.1(b)(4)(B)(i) (Nov. 2025); *see also* U.S.S.G. § 2K2.1 (Nov. 2025), Cmt. 8 ("[I]f the offense involved a firearm with a serial number that was modified such that the original information is rendered illegible or unrecognizable to the unaided eye . . . apply subsection (b)(4)(B)(i)").

The difference between the versions is immaterial in this case. The November 2024 Amendment "resolves the differences in how the circuits interpret the term 'altered[.]'" Amendments to the Sentencing Guidelines at 18 (Apr. 30, 2024). Notably, none of the circuits to rule on the issue interpreted the term "altered" in a way that precludes its application here, where the serial number can only be discerned through a microscope. The Second and Sixth Circuits interpreted the word "altered" to require the serial number to be illegible to the naked eye. *United States v. St. Hilaire*, 960 F.3d 61, 66 (2d Cir. 2020); *United States v. Sands*, 948 F.3d 709, 719 (6th Cir. 2020). The Fourth, Fifth, and Eleventh Circuits, however, required only that that the serial number be made less legible. *United States v. Harris*, 720 F.3d 499, 501 (4th Cir. 2013); *United States v. Perez*, 585 F.3d 880, 884 (5th Cir. 2009); *United States v. Millender*, 791 F. App'x 782,

783 (11th Cir. 2019) (non-precedential). Thus, the 2024 Amendment adopted the more demanding standard of the Second and Sixth Circuits, which require the serial to be illegible to the naked eye.

Under either version of the Guidelines, the Court should apply the 4-point enhancement under U.S.S.G. § 2K2.1(b)(4)(B)(i). The serial number on the recovered firearm was modified in such a way that it is illegible to the naked eye. Nothing in the Guidelines and law requires that it be completely obliterated and utterly illegible under any circumstances.

The defendant's offense level, therefore, after the three-point reduction for acceptance of responsibility, remains 23 (base offense level of 20, plus two points for reckless endangerment during flight—which the parties agree apply, plus four points for the modified serial number, minus three points for acceptance of responsibility). With a criminal history score of 4 points, placing him in Category III, the applicable Guideline range is **57 -71 months' incarceration**.

## THE UNITED STATES'S SENTENCING RECOMMENDATION

The United States recommends that the Court sentence the defendant at the top of the Guidelines, to a term of 71 months' incarceration, to be followed by a period of three years' supervised release given the nature and seriousness of his offense; his history and characteristics; and the need for the sentence imposed to satisfy the statutory requirements set forth in Sections 3553(a)(2)(A)-(D).

1. **The Nature, Circumstances, and Seriousness of the Offense**

This factor strongly supports the United States's recommended sentence. Here, the defendant pleaded guilty to carrying a loaded firearm, which, for someone who was previously convicted of a violent felony, is dangerous enough to justify a significant sentence. *See United States v. Blackson*, 2023 WL 1778194, at *7 (D.D.C. 2023) ("Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out

10

in public, poses an inherent risk of danger to the community."), *id.* at *10 ("The serious and violent nature of these prior convictions are probative of both defendant's capacity for and willingness to use firearms in a manner that poses a risk to others and the community."). Here, not only did the defendant possess a gun loaded with a bullet in the chamber and the safety disengaged, but he ran with it and discarded it down a storm drain, recklessly creating "a substantial risk of death or serious bodily injury to another person . . . ." U.S.S.G. § 3C1.2; *see also United States v. Tasaki*, 501 F. App'x 441, 444-45 (6th Cir. 2013) (holding that the defendant's "reaching for the gun while the police pursued him and discarding it in a residential neighborhood created a substantial risk of serious bodily injury to the officer, and anyone potentially present or finding the firearm"); *United States v. Grate*, 81 F. App'x 451, 453 (4th Cir. 2003) ("[D]iscarding a weapon in a heavily trafficked area is also conduct creating a risk of serious bodily injury.").

This case is the precise representation of why discarding a firearm during flight from police is so dangerous, and creates a substantial risk of death or serious bodily injury to another. The defendant's actions created a cascading chain of danger that placed multiple people—including motorists, residents, and ultimately law enforcement—at immediate risk. While fleeing with a loaded gun through the housing complex, the defendant scaled a wall approximately 20 feet high and jumped onto I-295. Then, rather than surrendering, he dropped his loaded firearm into a storm drain, not only creating the risk of injuring someone through an unintentional discharge, but it also put the police in a precarious situation.

The firearm's condition made the situation even more dangerous because it had a round chambered and the safety disengaged. It was, in effect, primed to fire at the merest touch of the trigger. Thus, officers could not leave the loaded firearm in a public storm drain and risk another person—an unsuspecting child, a resident, or a passing pedestrian—finding and handling it. Yet

the physical impediments of the storm drain made retrieval extraordinarily difficult. Ultimately, when Investigator Wayne David attempted to recover the weapon, the gun discharged, which is exactly the kind of catastrophic outcome the defendant set in motion the moment he chose to flee and discard his weapon. The bullet struck Investigator David in the head, ultimately taking his life.

Investigator David was a 25-year veteran of the Metropolitan Police Department. He started his career in the Third District before joining the Gun Recovery Unit in 2007, and eventually the Violent Crime Suppression Division in 2021. Starting in 2007, Investigator David's duties included recovering illegal guns across the District. Recovering guns can be a routine, but dangerous assignment, which is a critical component of the effort to control gun violence. As Mayor Bowser put it, "we can't measure the people who are still alive because of the guns Wayne got off the street . . . we can't measure that impact, just like we can't measure the love that Wayne leaves behind. But we know it's all around us."[1] Investigator David dedicated his career to deterring gun violence and serving the District of Columbia. But for the defendant's unlawful possession, dangerous flight, and intentional disposal of a loaded and unsecured firearm, Investigator David would be alive today. The nature and circumstances of the offense strongly favors a significant sentence.

**2. The Defendant's History and Characteristics**

The defendant's history and characteristics further supports the United States's recommended sentence of 71 months' incarceration. Despite his young age of 29 years old, this is not the first time the defendant has been convicted of a crime involving a firearm. His record

---

[1] Wayne David honored as father, jokester, veteran D.C. police officer, *Washington Post* (last updated September 12, 2024), *available at* https://www.washingtonpost.com/dc-md-va/2024/09/11/dc-police-officer-funeral/

12

reflects a disregard for lawful authority and a demonstrated willingness to endanger others to evade accountability.

His prior conviction involved a violent robbery of a T-Mobile store. There, his co-defendant brandished his firearm at the employees inside the store while the defendant forced an employee into the back and stole 28 phones from a safe. Following the robbery, the defendant and his co-defendant fled from police, leading police on a multi-jurisdictional chase for approximately 30 minutes. In that case, as in this one, the defendant used flight as a method of avoiding responsibility, which demonstrates his willingness to place others at risk to avoid responsibility for his actions.

After serving an aggregate sentence of seven years and one day's imprisonment, he was placed on supervised release, which expired on February 7, 2024—approximately six months before the offense here. The defendant was nineteen when he committed the robbery. But after serving approximately six years (between incarceration, a half-way house, and home detention), and three years' supervised release, within months the defendant was found here with another loaded, chambered gun, fleeing from police, and this time discarding his weapon in a dangerous way.

The defendant has been given multiple opportunities to change course. He has served a lengthy custodial sentence. He has experienced close supervision. He has been granted the chance to reintegrate into the community. Yet each of these opportunities has been squandered. Instead of choosing a lawful path, mere months after the expiration of his supervised release, the defendant armed himself once again, fled from police once again, and discarded a loaded firearm. This time, his choices resulted in the death of a law enforcement officer.

This defendant's history is not merely a record of past mistakes. It is a powerful indicator of his unwillingness to comply with the law and his repeated resort to extremely dangerous conduct. This history weights heavily in favor of a substantial sentence.

   3.   **The Need for the Sentence Imposed**

The defendant's sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). Here, the United States's recommended sentence is sufficient, but no greater than necessary to meet the goals of sentencing.

In this case, there is a compelling need to deter gun possession as a precipitator of violence—especially for those like the defendant who have already committed a prior violent crime involving a firearm. This favors a significant sentence withing the Guideline range. Similarly, because of the needless danger caused by the related practice of discarding a loaded, chambered firearm while running from police through a public housing complex on a Wednesday during rush hour, a significant sentence at the top of the Guideline range is appropriate. It has become too commonplace for defendants who illegally possess firearms to attempt to conceal their crime by running from police and discarding their firearm in a way that puts everyone around them at risk. A significant sentence here is needed to deter others from engaging in similar conduct, which poses a tremendous danger to the community.

Significantly, this defendant's history has demonstrated that firearm possession is never a passive act for him; rather, it is consistently paired with flight, confrontation, and reckless endangerment. A sentence of 71 months is necessary to communicate that repeated firearm offenses will be met with increasingly serious consequences.

Specific deterrence is equally vital here. The defendant's last sentence—while significant, and likely greater than the sentence that will be imposed here—was insufficient to deter him from possessing another gun. Ands he committed this offense only months after completing a combined sentence of seven years of incarceration and three years of supervised release. His conduct reflects a clear refusal to comply with the law, even after ample opportunity for rehabilitation. Apparently, only a significant sentence at the top of the Guidelines can deter him from repeating the kind of dangerous behavior that led to the events in this case.

## V.     CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court sentence the Defendant to 71 months' incarceration, followed by three years' supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ John Parron*
John Parron
PA Bar No. 324503 / N.Y. Bar No. 5808522
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 252-6885
John.Parron@usdoj.gov